## N. C. Sorensen, Administrator, Appellant, v. Chicago Railways Company et al., Appellees.

### Gen. No. 24,720.

1. STREET RAILROADS, § 66*—*duty to driver of automobile in dangerous situation.* Even though one driving an automobile along a street car track gets himself, through his own negligence, into a dangerous situation, if, after he finds himself in danger, he exercises ordinary care, it is the street-car motorman's duty to avoid colliding with the automobile, if by the exercise of ordinary care he can do so, and a breach of that duty on the motorman's part may entail liability upon the street railroad company for injuries caused by the collision.

2. STREET RAILROADS, § 66*—*care required as to automobile in dangerous situation.* A motorman seeing an automobile approaching on the car track ahead of him and another street car approaching behind the automobile on the other track is chargeable with the knowledge which ordinary care will give him, and, having that knowledge, is bound to exercise ordinary care appropriate to the particular situation.

3. STREET RAILROADS, § 131*—*sufficiency of evidence in action for death of driver of automobile caught between two cars.* In an action against a street railway company to recover for the death of one killed when the automobile which he was driving was crushed between cars coming from different directions on a street, the snowbanks on the sides of which prevented the automobile from getting away from the car lines, evidence examined and *held* sufficient to sustain a judgment for defendant.

· 4. EVIDENCE, § 277*—*admissibility of photographs of scene of accident.* In an action against a street railway company to recover for the death of one killed when the automobile which he was driving was crushed between two street cars approaching from opposite directions, photographs of the *locus in quo* taken the morning after the accident and not purporting to show the relations of the cars and the automobile at the time of the accident but offered merely to give the jury a general picture of the surface of the street as it existed about 14 hours after the accident are admissible.

5. TRIAL, § 91*—*when objection to admission of photographs insufficient.* A statement by plaintiff's counsel, "I will preserve my objection," upon the introduction of photographs of the *locus in quo* of an accident, is not a sufficient objection to their admission in evidence.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

6.  STREET RAILROADS, § 148*—*when instruction properly modified by requiring driver to use care to extricate himself from position of peril.*  In an action to recover for the death of a person killed when the automobile which he was driving was crushed between two street cars approaching from opposite directions on different tracks, an instruction which does not require that it be shown that deceased, after he was in danger, exercised ordinary care to extricate himself, is properly modified by adding that it was his duty, after having exposed himself to the risk, to make such efforts to avoid injury to himself as an ordinarily reasonable man in the exercise of due care for his own safety would exercise under such circumstances, since a failure on his part to exercise such care would make his negligence as much the proximate cause of the injury as was the motorman's negligence.

7.  APPEAL AND ERROR, § 1637*—*when instructions not ground for reversal.*  Instructions in an action to recover for the death of one killed when the automobile which he was driving was crushed between two street cars, while in some measure inapt to the declaration in charging upon the question of wilfulness and wilful injury, since the declaration charged wilful negligence, *held* not to be ground for reversal since the law applicable to the facts was properly presented in other instructions.

8.  APPEAL AND ERROR, § 1411*—*consideration of verdict in conflicting evidence.*  Where, in a personal injury case in which the evidence is conflicting, the jury find for the defendant, the reviewing tribunal will treat the jury's finding with considerable respect.

Appeal from the Superior Court of Cook county; the Hon. HUGO PAM, Judge, presiding.  Heard in the Branch Appellate Court at the October term, 1918.  Affirmed.  Opinion filed March 18, 1920.

CLELAND, LEE & PHELPS, for appellant; LESTER E. LEE, of counsel.

HARRY P. WEBER, GEORGE W. MILLER and ARTHUR J. DONOVAN, for appellees; JOHN R. GUILLIAMS and ROBERT J. SLATER, of counsel.

MR. JUSTICE TAYLOR delivered the opinion of the court.

The plaintiff, as administrator of the estate of Alfred Sorensen, deceased, brought suit against the

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

defendant, the Chicago Surface Lines, for damages for the death of Alfred Sorensen who was killed when an automobile which he was driving was crushed between two street cars belonging to the defendant. A trial was had and the jury brought in a verdict finding the defendant not guilty. This appeal is taken therefrom.

The declaration consists of three counts. The first count alleged that the deceased was driving an automobile northwesterly along Milwaukee avenue, on which the defendant was operating street cars; that the deceased was in the exercise of due care; that it was the duty of the defendant to use ordinary care; that the defendant did not regard their duty or exercise due care but did then and there "operate and move in a highly wilfully and grossly negligent and grossly reckless rate of speed, and in other respects show carelessness and wilfully, negligently and grossly negligently drive and operate said street car, which was then and there being driven in a northwesterly direction; that by and because of the wilful, careless, reckless and wilfully and grossly negligent conduct of the defendant, * * * both of the said street cars then and there entrapped and ran against said automobile" and crushed it; that the said Milwaukee avenue was in an unsafe condition and unfit to travel and dark and obstructed on each side by a barrier of great size of snow, ice and street accumulations; that the automobile necessarily and unavoidably slipped towards and was forced and confined between and entrapped between the street cars of the defendant so that both of said street cars of the defendant ran against and crushed the automobile with great force and violence and thereby "because of the recklessness, carelessness and wilful and gross negligence" of the defendant, Alfred Sorensen, was struck and crushed with great force and violence and killed.

The second count is similar to the first count except

that its allegations of negligence, etc., pertain to the driving of the street car which was traveling southwest along Milwaukee avenue.

The third count is similar to the first count except that the allegations of negligence, etc., pertain to the operation of both of the street cars referred to in the first count. The *ad damnum* is $10,000.

The defendant filed a plea of the general issue. The suit was originally brought against the Surface Lines and the City of Chicago. On February 21, 1918, the plaintiff discontinued as to the latter.

The accident occurred somewhere between 7:00 and 7:30 p. m., after dark, on Sunday, January 24, 1915, on Milwaukee avenue, about 10 feet south of the south line of Caton Place. It was a cold day and the ground was covered with snow. The automobile, which belonged to N. C. Sorensen, the father of the deceased, was an Abbott-Detroit seven-passenger touring car. Alfred Sorensen worked for his father in the express business; he had had experience in driving a truck for about 4 years; he had driven the Abbott-Detroit for about 3 or 4 months. On the Sunday in question, he had taken the touring car out, for a ride, and at about 5 o'clock in the afternoon, he had with him in the machine three friends, Deichstetter, Wittig and Sodman, having met them at Fullerton and Milwaukee avenues. Sorensen drove the machine through Lincoln Park along the Lake Shore Drive, down Michigan avenue to Madison street then on Madison street to Delphino's saloon, where another associate, one Arrighi, got into the machine. That was about 6 p. m. The young men were intending going to the Star and Garter Theater on Halsted and Madison streets, where they generally went on Sunday evening. At about 6 p. m., for about 20 minutes, they stopped at Delphino's saloon and some of them had some drinks. Sorensen did not drink anything intoxicating. After Arrighi got in, they drove west on Madison to Robey

street, north on Robey street to another saloon where they stopped about 10 minutes in order that Wittig could pay a debt to the saloonkeeper. Sorensen, there drank nothing intoxicating. They then drove north on Robey street to Milwaukee avenue. Sorensen, the deceased, was driving and Deichstetter was sitting with him in the front seat; Arrighi was in the middle, on the back seat; Wittig on his right and Sodman on his left. They were going to take the automobile to 1800 North Western avenue, and take a Western avenue street car back to Madison street and then an eastbound Madison street car to the Star and Garter Theater to attend a play which began at 8:15. They turned northward into Milwaukee avenue at Robey street.

Milwaukee avenue runs northwesterly and southeasterly. The top was up on the automobile and the side curtains down. Sorensen drove in the northwesterly bound track for about a half block when, hearing a street car bell behind, he turned into the southeasterly bound track. Arrighi states that the automobile went some distance and then started to turn back, but then another car, called the Armitage avenue car, going northwesterly, came up; that as soon as they turned on the southeasterly bound track they saw a southbound Milwaukee avenue car about two blocks away; that Sorensen tried to get ahead of the Armitage avenue car, but he did not have time; that they ran about half a block before the automobile was struck. He further stated that Sorensen tried to get over on the west side but could not owing to a ridge of snow 8 or 12 inches high along the track; that the speed of the automobile was increased towards the last, when they saw the Milwaukee avenue car was right on top of them, and tried to get ahead of the Armitage avenue car; that car increased its speed too; that they did not have time to get behind it; that the collision occurred about 400 or 500 feet

from North avenue; that both Wittig and he spoke to Sorensen about pulling out to the left just after trying to get on the northbound track.

Deichstetter's evidence is that he was in the automobile from about 5 o'clock p. m. until 7:30, just before the accident, save for the time he spent in certain saloons with his friends; that he had his first drink that day at Delphino's and had about a dozen drinks of beer before the accident; that he did not remember anything that happened after they turned from Robey street into Milwaukee avenue; that he was not under the influence of liquor. His inability to remember is unexplained.

The evidence is conflicting as to the exact relation of the two street cars and the automobile just before and at the time of the collision. It is a fair inference, however, that just before the disaster Sorensen had driven the automobile partly over towards the west rail of the northbound track, and that, at the moment of impact, he either was going northwesterly and was struck by the Milwaukee avenue car and the automobile crushed between it and the Armitage avenue car —and the greater weight of evidence favors that conclusion—or simply caught about evenly between the two street cars and crushed. There is evidence that just before the collision the two cars were going 15 miles or more per hour and that the automobile was going faster than the Armitage avenue car. The cause was tried before a jury and a verdict rendered finding the defendant not guilty. Judgment was entered on the verdict. This appeal was taken therefrom.

It is the contention of the plaintiff (1) that even though the plaintiff had negligently put himself in a place of danger and thus exposed himself to risk of injury, yet, if such injury was proximately caused by the defendant's omission or failure, after such notice of plaintiff's danger as would put a prudent man upon his guard to avoid the injury, and the defendant did

not use ordinary care to avoid injury to the plaintiff, then the defendant would be liable; (2) that the admission of certain photographs was erroneous; (3) that error was committed in the refusal and giving of certain instructions.

(1) The plaintiff blames the defendant because the motorman of the Milwaukee avenue car, after he had notice of the plaintiff's danger, did not do those things which would have prevented the collision. He claims that the proximate cause of the disaster was the motorman's failure to act with ordinary care after he saw the situation of the two street cars and the automobile, and knew approximately their speed and what would normally take place unless something was done by him to prevent it. He insists that the motorman, under the circumstances, if he had exercised ordinary care, had a fair chance to prevent the collision; that, although Sorensen, through his own negligence, had gotten into a seemingly dangerous situation, the disaster would not have occurred if the motorman had been careful. And, if the evidence sufficiently proves those facts and that Sorensen, after he found himself in danger, exercised ordinary care, we are inclined to agree, and to submit that it was the motorman's duty to prevent the collision, if by the exercise of ordinary care he could do so; and that a breach of that duty might entail liability. In *Illinois Cent. R. Co. v. Godfrey*, 71 Ill. 500, where the plaintiff being unlawfully upon the track of the defendant railroad was injured by a passing train, the court said: "And if defendant's servants, who were in the management of the engine, after becoming aware of plaintiff's danger failed to use ordinary care to avoid injuring him, defendant might be liable." *Swanson v. Chicago City Ry. Co.*, 242 Ill. 388; *Chicago West Div. R. Co. v. Ryan*, 131 Ill. 474. But, although, in the instant case, the motorman was chargeable with the knowledge which ordinary care would give him, and, having that knowl-

edge, was bound to exercise ordinary care, appropriate to the particular situation, it was for the jury to say whether his actual conduct, as shown by the evidence, in driving the street car as he did, was negligent, and also whether Sorensen, after being in danger, was negligent.

It may be argued that Sorensen, when he found himself faced with the Milwaukee avenue car, and first undertook to go over to the west and failing there then undertook to get ahead of the Armitage avenue car, was in the exercise of ordinary care, was exercising "the degree of care required of him under the circumstances"—Mr. Justice Cartwright in the *Swanson* case—and so was not guilty of that negligence which was the proximate cause of the injury; that is, considering the three participants, the two motormen of the street cars and the driver of the automobile, just prior to the collision, when the three vehicles were all in motion, and near to each other, the proximate cause of the disaster was the omission of the motorman of the Milwaukee avenue car, Sorensen, having done all he could, with at least ordinary care, after he found himself entrapped. In other words, that the only one who failed to exercise ordinary care, after the three moving vehicles were in imminent danger of a collision, was the motorman of the Milwaukee avenue car; and that, therefore, his omission, or failure to act with ordinary care, was alone the proximate cause of the disaster.

Counsel for the plaintiff admit that the automobile, being in a trap, was undoubtedly speeded up to get ahead of the Armitage avenue car, and argues that that was the only means of escape, there being ice and snow as a barrier to the west; that the only chance to escape injury was to do what he did and rely upon the motorman on the Milwaukee avenue car to exercise ordinary care and slow up or stop.

The question arises, did Lamby, motorman of the

Milwaukee avenue car, have an opportunity, with the exercise of ordinary care, to avoid the collision. Lamby was 27 years of age and had been a motorman for about 3 years. He had driven over the place in question for 2 years. On the night in question his last stop was at Bloomingdale road, two blocks north. He says he first saw the automobile when it was about 300 feet away, and that it came out from behind the Armitage avenue car and crossed the southbound track and went over between the curb and the southbound rail, that its speed was then increased and it crossed back over the southbound track and ahead of the Armitage avenue car, for about 50 feet, and then turned back on towards the southbound rail, and "was zigzagging back and forth from the south to the northbound rail"; that then his car and the automobile collided, the southeast corner of the car striking the left side of the automobile. He says, that he had the power on when he first saw the automobile, but that he threw it off when he saw the automobile go out on his track, and that he put it back on when he saw the automobile driven in front of the Armitage avenue car. Throwing off the power, he says, had decreased the speed of his car about 5 miles an hour. Further he says that when the automobile again went back on his track he threw off the power, applied the brakes and reversed and put on the sand, and that after his car struck the automobile the front end of the car ran within 10 feet of the south end of the Armitage avenue car, and that the rear trucks on his car left the rails towards the west; that he, himself, was cut about the face and stunned; that the fuse on his car blew out just before the accident, that being usually caused by reversing the motors; that the Armitage avenue car was moving slowly at the exact moment of the collision. He also states that if his car was going 24 miles an hour it could be stopped in about 200 feet, and at about 15 miles an hour, in about 75 feet. On

Sorensen v. Chicago Railways Co., 217 Ill. App. 174.

cross-examination he stated that when he first saw
the automobile he was on eight points going 15 or 18
miles an hour; that he generally threw his power off
and on once or twice in a block. Also, that at the time
the automobile began to zigzag he was going from 15
to 18 miles an hour and that for 25 feet, before his car
collided with the automobile, he was running with the
motors reversed and the sand going. As to the speed
of his car, he stated that he did not believe it was 12
miles an hour.

On the subject of the speed of the Milwaukee avenue
car, besides Lamby, six witnesses testified: Boss puts
it at between 16 and 20 miles an hour; Winn, the
conductor, at 17 to 18 miles an hour about 4 seconds
before the accident; Hanson, that the car was going
faster than usual in going from Bloomingdale road
up to the time of the accident; Cuycci, that it was run-
ning on nine points up to the time of the accident;
Frederickson, that it was going 30 miles an hour; and
Kellner, that it went 25 miles an hour from Blooming-
dale road to the time of the accident.

The evidence as to the conduct of the motorman,
that is, in driving the Milwaukee avenue car, is con-
tained in the testimony—outside of his own—of the
witnesses Boss, McGrath, Winn, Hanson, Cuycci,
Frederickson and Kellner. All those witnesses were
on the Milwaukee avenue car at the time and all on
the front platform, except Alice McGrath and Winn,
the conductor. The evidence of Boss is that he sud-
denly felt a jolt when the automobile was 90 to 100
feet away; that of McGrath, that the motorman put
on the brakes just before the crash; that the car gave
a jerk and then the collision occurred; that of Winn,
that there was an application of air at Caton street;
immediately afterwards there was a flash and a fuse
was blown; that between the flash and the collision
one or two seconds elapsed; that of Hanson, that
previous to the impact he felt no noticeable diminu-

tion of the speed of the car from the time it was a
block away until a second before; that of Cuycci, that
the car was running on nine points; that the motor-
man did not turn the controller off at any time up to
the time of the accident; that before the impact he
did not feel any jar; that he did not know whether air
was applied or the motors reversed before the impact;
that he did not see the motorman do anything to shut
off the power or put on the brakes before the collision;
that of Frederickson, that from Bloomingdale road
it made no stop until the impact; that the controller
was wide open when he first saw the automobile 100
feet ahead; that he did not see the motorman turn
off the power or at any time do anything; that he felt
no jar until the collision; that the speed of the car did
not appear to lessen previous to the final impact; that
a fuse was blown after the car left the rails; that
he did not know whether the motorman applied the
air and reversed at time; that of Kellner, that the car
was going 25 miles an hour when it left Bloomingdale
road and did not slacken its speed previous to the acci-
dent; that the controller handle was turned over all
the way and the power was all on; that the motorman
did not appear to do anything up to the time he struck
the automobile; that he did not see him put on the
brakes or reverse the motor or turn off his power be-
fore the collision.

Concerning the speed of the Armitage avenue car,
Speckt, a bookkeeper who was on that car at the time,
says that it was going at a pretty fair rate of speed
but that it seemed to come to a dead stop at the time
of the collision. Blonsky, a peddler who was stand-
ing at the corner of Milwaukee avenue and Wabansia,
puts it at 15 miles an hour. Disseldorf, the conductor
of the Armitage avenue car, puts it at 20 miles an
hour about 4 seconds before the accident. Blake, the
motorman, at about 15 miles an hour when the auto-
mobile was trying to pass, but that he slackened the

speed and was at a dead stop at the time of the collision. Cuycci and Frederickson, both of whom were on the front platform of the Milwaukee avenue car, put it at 30 miles an hour.

From the foregoing analysis of the testimony of the various witnesses concerning the speed of the two cars and the actions of the motorman of the Milwaukee avenue car, it is obvious that there is a sharp conflict, especially as to the speed of the Milwaukee avenue car and the conduct of the motorman Lamby. Lamby says he threw the power off when he first saw the automobile and then threw it on again when he saw the automobile go out on the north track. He further says he was going 15 to 18 miles an hour when the automobile was zigzagging and about 25 feet before the collision he was running with the motors reversed and the sand going. That, by itself, tends to prove that he not only recognized the dangers of the situation but exercised appropriate care. Boss, in part, corroborates Lamby in that he says he felt the jolt when the automobile was 90 to 100 feet away. Likewise the witness McGrath indicates that at least the brakes were put on before the crash came. Winn's testimony is also in corroboration of Lamby as he says there was an application of air at Caton street and then a fuse was blown and then one or two seconds afterwards the collision. On the other hand, the testimony of Hanson, Cuycci, Frederickson and Kellner is to the effect that the speed of the Milwaukee avenue car was not decreased prior to the collision, save that Hanson limits it to a second before. Cuycci and Frederickson also testified that they felt no jolt until the collision, and they, and also Kellner, testify that they did not see the motorman turn off the controller up to the time of the accident.

Having given painstaking consideration to all the evidence, and bearing in mind that there is evidence tending to prove that the motorman of the Milwaukee

avenue car was in the exercise of ordinary care in endeavoring to avoid the disaster, and that the jury brought in a verdict for the defendant, we feel bound to sustain the judgment.

(2)    It is claimed by counsel for the plaintiff that the trial court erred in admitting in evidence certain photographs of the *locus in quo*. The witnesses, Deutsch, a photographer, testified that he took some photographs of Milwaukee avenue in the vicinity of Alice and Caton Place in January, 1915. When asked if he made a record or memorandum of it, at the time, he answered: "I had a card, yes sir." He was then asked, if, by looking at the memorandum, he could refresh his recollection so as to state correctly the date. To that, counsel for the plaintiff objected unless his recollection was exhausted. Then counsel for the defendant asked the witness if, without looking at the memorandum that he made, his recollection was clear as to the date, and then if he could not recollect the exact date to say so, to which the witness answered: "No sir, I can't recollect it, it is on the card." Following that, he was asked the question, on what date did you take the photographs, and he answered January 25. When asked the hour he stated: "About 10:25."

When counsel for the defendant, after showing by the witness that the two photographs were correct representations of the street as it existed at that time, offered it in evidence, counsel representing the plaintiff merely said: "I will preserve my objection." To that the court responded: "The objection is overruled."

On cross-examination the witness stated that he received a card in the morning, did his work, and returned with the card filled out, and that it was put away by his superior. He further stated that the original card, which his chief made out, was at the office, and that the one then before him in court was not the

original card but that he put the time down on the card he had.   Counsel for the defendant then said: "Well then I don't need to send over to get that." Counsel for the plaintiff responded: "Oh, not in this case." The witness further stated on cross-examination that the pencil memorandum on the card was made by him at the time, and when asked whether he had an independent recollection, he stated that the date was January, 1915, and that in a way he had an independent recollection and that what was on the card was the truth.   A close examination, of what the record contains concerning the proffer and admission of the photographs, shows that not only no sufficient objection was made, but that counsel for the plaintiff quite properly waived sending for certain evidence as to the time mentioned and was satisfied to let the evidence, that was in, stand.

As the two photographs were taken on the morning of January 25, 1915, "of Milwaukee avenue in the vicinity of Alice Place and Caton Place," as the photographer testified, and that being the *locus in quo,* we know of no reason why they were not competent. They did not purport to show the relations of the cars and the automobile at the time of the disaster; they were offered merely to give the jury a general picture of the surface of the street as it existed about 14 hours afterwards.   We are of the opinion that their admission was not error.

(3)   It is contended that the trial judge erred in making an alteration in a certain proffered instruction.   The latter instruction did not require that it be shown that Sorensen, after he was in danger, exercised ordinary care to extricate himself.   The court interjected the words "after having exposed himself to such risk and injury, he thereupon made such efforts to avoid injury to himself as an ordinary reasonable man in the exercise of due care for his own safety would exercise under such circumstances." Those

words were essential. As said in *Dyerson v. Union Pac. R. Co.,* 74 Kan. 528: ''If just before that climax only one party had the power to prevent the catastrophe, and he neglected to use it, the legal responsibility is his alone. If, however, each had such power and each neglected to use it, then their negligence was concurrent, and neither can recover against the other.''

If the jury believed that Sorensen was negligent up to the last moment, that he could and should have gone, if he exercised ordinary care, over to the north between the tracks and the curb, or that he should have tried to stop, and did neither, then, even though they were of the opinion that the motorman of the Milwaukee avenue car was guilty of negligence, there would be no liability; the reason being that the proximate cause was as much the negligence of Sorensen as the motorman.

Complaint is made that error was committed in giving certain instructions to the jury wherein the word ''wilfulness'' and phrases ''wilfully injure'' and ''wilfully injured'' were used, the theory of the plaintiff being that the declaration did not charge the defendant with any wilful injury but charged that the defendant operated and moved its cars at a ''high wilfully and grossly negligent and grossly reckless rate of speed,'' and did ''so careless and wilfully negligently and grossly negligently drive and operate,'' etc. In the declaration the words ''wilful'' and ''wilfully'' are used as adjectives modifying the words ''negligently'' and ''negligent conduct.''

One of the twenty instructions given for the defendant is as follows:

''Before the plaintiff can recover against the defendants on account of wilfulness, he must prove by a preponderance of the evidence that the conduct of the defendants was wilful. Wilfulness sometimes implies an intention to inflict an injury or damage, and sometimes it is evidenced by such a want of care and regard for the rights and safety of others as implies a

complete disregard of consequences. You cannot find the defendants guilty of wilfulness unless you believe from a preponderance of the evidence that the servant or servants of the defendants, in charge of the car or cars in question, intentionally inflicted the injury to the deceased complained of, or that his or their conduct indicated such a want of care for the safety of others as implied a complete disregard of consequences. And if you believe from the evidence, under the instructions of the court, that the conduct of none of the servants of the defendant was wilful, you must find in favor of the defendants as to the charge of wilfulness.''

Although that instruction was in some measure inapt as the declaration did not charge wilfulness or wilful injury but wilful negligence, we are of the opinion that instructions 14 and 15 sufficiently clearly and exhaustively announced to the jury the law that was actually applicable to the evidence presented.

Although we have found great difficulty with this cause and do not feel strongly convinced that our judgment is right, we are necessarily impressed with the fact that the evidence was conflicting, and also, that the jury found for the defendant; and as we said in *Levinson v. Morse,* 216 Ill. App. 637, ''Where in a personal injury case, after a fair trial, a verdict has been rendered for the defendant, it is but reasonable that a court of review, detached as it is from the pregnant atmosphere of the trial court, should treat that conclusion with considerable respect.''

Finding no error in the record the judgment is affirmed.

*Affirmed.*

MR. PRESIDING JUSTICE THOMSON and MR. JUSTICE O'CONNOR concur.